2003 WY 79

**Ernest SALAS, Appellant (Respondent),**

v.

**GENERAL CHEMICAL, Appellee (Petitioner).**

No. 02–111.

Supreme Court of Wyoming.

June 26, 2003.

Michael D. Newman of Hampton & Newman, LC, Rock Springs, Wyoming, Representing Appellant.

Jason M. Tangeman of Anthony, Nicholas, Tangeman & Yates, LLC, Laramie, Wyoming, Representing Appellee.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1]   In May 1999, General Chemical employed appellant, Ernest Salas (Salas), as a shuttle car operator in its trona mine.   On May 3rd, Salas was injured when a slab fell from the side of the mine, "rolled" him to the ground, and pinned him there.   Following a contested case hearing, the hearing examiner found that the accident materially aggravated the pre-existing degenerative condition in Salas' right knee.   The district court reversed the hearing examiner's determination, and Salas appeals the district court's decision to this Court.   We reverse.

### ISSUES

[¶ 2]   Salas phrases the issue on appeal as follows:

Was the Hearing Examiner's decision awarding benefits supported by substantial evidence?

General Chemical phrases the issue in substantially the same manner.

### FACTS

[¶ 3]   In 1997, Salas underwent a right knee arthroscopy that revealed

a torn meniscus which had been present on the medial side for some time and that torn meniscus was removed.   The actual joint itself looked pretty good.

. . .

... The right knee will be sore for a considerable time from the removal of the medial meniscus but eventually should be a reasonably good knee.

In May 1998, Salas reportedly experienced right knee pain for a two-week period, and a doctor aspirated fluid from the knee.   During a November 1998 physical, another doctor noted the "persistence of right knee pain along the medial aspect," and "[p]robable degenerative arthritis of the knees."   In a follow-up visit one month later, the same doctor noted that Salas' "knees feel much better with [medication.]"

[¶ 4]   On May 3, 1999, General Chemical employed Salas as a shuttle car operator in its trona mine near Green River.   That day,

a four- to five-hundred pound slab fell from the side of the mine, "rolled" Salas to the ground, and pinned him there. The hearing examiner found that Salas was "pinned to the ground, by the slab, in a crouching position, with his left leg stretched out behind him, his weight being applied to his right knee."[1] Salas stated that when he was pinned beneath the slab, his right knee ultimately folded underneath him. He demonstrated the position of his body for the hearing examiner, and it appeared from the demonstration that Salas' right knee was "bent at an angle and his body kind of twisted to the right side."

[¶ 5] Salas reportedly suffered abrasions to his left shoulder, left elbow, and right knee. After a break, Salas returned to work and did not immediately suffer pain in his right knee, but noted that his "adrenaline was pumping pretty good." Salas testified that he experienced "a clicking" in his right knee in June 1999. Within a "month or two" after the accident, Salas stated that he also experienced a "new," "constant pain" on the inside of his right knee to a degree that when walking, "something would be aggravating [his] knee to where it was painful to walk anymore." Salas claimed that while he previously had experienced soreness in the knee, he had never experienced this kind of "constant" pain whenever his knee would "open or close," and felt that the May 3rd accident "had aggravated it." A co-worker noticed that between May and November 1999, Salas "was having a hard time walking and his gait had changed quite a bit."

[¶ 6] In October 1999, Salas consulted Dr. Thomas Bienz, an orthopedic surgeon, who noted that Salas had reportedly experienced "repeat knee pain, increased swelling and some popping on the medial side" since the May 1999 accident, and the pain was "progressively getting worse." According to Dr. Bienz, x-rays revealed "significant degeneration in the medial compartment" and "extensive medial osteophytes and very little joint space remaining." The doctor concluded that Salas suffered from "[a]cute on chronic right knee pain with extensive medial compartment degeneration . . . ." He initially recommended treatment in the form of physical

therapy and medication. By November 1999, Salas had experienced some "good relief of pain," but continued to "report medial sided joint line pain as well as occasional snapping and popping inside his joint," which the doctor confirmed with further examination. The doctor recommended that physical therapy in combination with medication continue, but noted that in "the event that at six weeks he continues to have discomfort, consideration will be given to arthroscopy and debridement."

[¶ 7] Dr. Bienz performed a right knee arthroscopy in March 2000. During the arthroscopy, he discovered a degenerative loss of "articular cartilage" in the knee's medial compartment, and, although it was difficult to assess, what appeared to be a "degenerative-type tear" in the medial meniscus. Salas returned to work in April or May 2000, and his knee "didn't have the pain that it did before and it was back to just the soreness."

[¶ 8] The Division of Workers' Safety and Compensation (Division) issued an amended final determination in February 2000, awarding Salas benefits "for acute treatment only." Both Salas and General Chemical objected to the determination, and a contested case hearing was held in October 2000. The hearing examiner received medical deposition testimony from Dr. Bienz and Dr. Rheim Jones, also an orthopedic surgeon. Dr. Bienz diagnosed Salas with "acute on chronic" right knee pain and stated that the May 1999 accident aggravated or exacerbated the pre-existing degenerative condition in Salas' right knee. Dr. Jones, who performed a "record review" for the Division, ultimately concluded that

> [b]ased on the available information, to a reasonable degree of medical certainty, there is not a causal relationship between [Salas'] current complaints and the reported injury of 05/03/99.

> The record clearly demonstrates Mr. Salas had degenerative changes of the medial compartment of the right knee before the injury of 05/03/99 . . . .

---

1. General Chemical does not contest this finding.

The accident of 05/03/99 is not consistent with a significant injury to the right knee....

Mr. Salas's right knee problems are more probable than not related to his initial medial meniscus injury and subsequent degenerative changes caused by the torn fragment and added medial compartment load created by the absence of the medial meniscus.

Relying primarily on the testimony of Dr. Bienz and Salas, the hearing examiner found that the May 1999 accident materially aggravated the pre-existing degenerative condition in Salas' right knee and awarded Salas worker's compensation benefits.

[¶ 9]  General Chemical petitioned the district court to review this determination, and the district court reversed the hearing examiner. In a detailed decision letter, the district court concluded that the "evidence leans against Salas," the "greater weight of the evidence leans toward disallowing benefits for Salas' preexisting injury," and the medical testimony did not provide a sufficient "link between the work-related accident and the subsequent injury." Salas appeals from that decision.

### STANDARD OF REVIEW

■■■  A claimant for worker's compensation benefits has the burden of proving all the essential elements of the claim by a preponderance of the evidence in the contested case hearing. *In Re Worker's Comp. Claim of Johnson*, 2001 WY 48, ¶ 7, 23 P.3d 32, ¶ 7 (Wyo.2001). We recently held that the substantial evidence test is the appropriate standard of review in appeals from Wyoming Administrative Procedures Act contested case proceedings when factual findings are involved and both parties submit evidence. *Newman v. Wyoming Workers' Safety and Comp. Div.*, 2002 WY 91, ¶ 22, 49 P.3d 163, ¶ 22 (Wyo.2002).... Because both parties presented cases-in-chief, we apply the substantial evidence standard. We afford respect and deference to a hearing examiner's findings of fact if they are supported by substantial evidence. *Haagensen v. State ex rel. Workers' Comp. Div.*,

949 P.2d 865, 867 (Wyo.1997).  Our task is to examine the entire record to determine whether substantial evidence supported the hearing examiner's findings. *State ex rel. Wyo. Workers' Comp. Div. v. Waggener*, 946 P.2d 808, 814 (Wyo.1997).  We will not substitute our judgment for that of the hearing examiner when substantial evidence supports his decision. *Id.* Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. *Id.* A hearing examiner's conclusions of law are afforded no special deference and will be affirmed only if truly in accord with law. *State ex rel. Wyo. Workers' Comp. Div. v. Barker*, 978 P.2d 1156, 1159 (Wyo.1999).

*Hermosillo v. State ex rel. Wyoming Workers' Safety and Compensation Div.*, 2002 WY 175, ¶ 6, 58 P.3d 924, 926 (Wyo.2002).

■■■  [¶ 10]  An "injury" does not include a "condition preexisting at the time of employment with the employer against whom a claim is made[.]" Wyo. Stat. Ann. § 27–14–102(a)(xi)(F) (Michie 1997).  The

burden is upon the claimant to prove that his work accident, not his preexisting condition, caused the necessity for the surgery. *Matter of Corman*, 909 P.2d 966, 970 (Wyo.1996); *Matter of Claim of Fortier*, 910 P.2d 1356, 1358 (Wyo.1996).  While aggravation of a preexisting condition is a compensable injury, *Matter of Injury to Carpenter*, 736 P.2d 311, 312 (Wyo.1987), claimant must prove that his employment aggravated, accelerated, or combined with the disease or infirmity to produce the disability for which compensation is sought. *Romero v. Davy McKee Corp.*, 854 P.2d 59, 61 (Wyo.1993); *Lindbloom v. Teton Int'l*, 684 P.2d 1388, 1390 (Wyo. 1984).

*State ex rel. Wyoming Workers' Compensation Div. v. Roggenbuck*, 938 P.2d 851, 853 (Wyo.1997).  "To prove aggravation of a preexisting injury, the claimant must demonstrate that the 'work effort contributed to a material degree to the ... aggravation ... of the existing condition of the employee.'" *Frazier v. State ex rel. Wyoming Workers' Safety and Compensation Div.*, 997 P.2d 487,

490 (Wyo.2000) (*quoting Lindbloom v. Teton Intern.*, 684 P.2d 1388, 1389–90 (Wyo.1984)) (emphasis omitted).

> "[T]he causal connection between an accident or condition at the workplace is satisfied if the medical expert testifies that it is more probable than not that the work contributed in a material fashion to the . . . aggravation . . . of the injury. We do not invoke a standard of reasonable medical certainty with respect to such causal connection. Testimony by the medical expert to the effect that the injury 'most likely,' 'contributed to,' or 'probably' is the product of the workplace suffices under our established standard. . . .
>
> [U]nder either the 'reasonable medical probability' or 'more probable than not' standard, [a claimant succeeds] in demonstrating the causal connection by a preponderance of the evidence."

*Hall v. State ex rel. Wyoming Workers' Compensation Div.*, 2001 WY 136, ¶ 16, 37 P.3d 373, 378 (Wyo.2001) (*quoting In re Pino*, 996 P.2d 679, 685 (Wyo.2000)).

[¶ 11] Whether the employment " 'aggravated, accelerated, or combined with the internal weakness or disease to produce the disability is a question of fact.' " *Brees v. Gulley Enterprises, Inc.*, 6 P.3d 128, 131 (Wyo.2000) (*quoting Lindbloom*, 684 P.2d at 1390).

### DISCUSSION

[¶ 12] The hearing examiner found that Salas "had pre-existing conditions" and "significant degenerative changes" in his right knee prior to the May 3, 1999, accident. This finding is essentially undisputed based on the information contained in Salas' medical records and the testimony of Drs. Bienz and Jones.

[¶ 13] At issue is the hearing examiner's finding that

> [Salas] did suffer a material aggravation of the . . . pre-existing condition in his right knee as a result of [his] May 3, 1999 work related accident that required treatment, arthroscopic surgery and a period of time for temporary total disability after said surgery.

In particular, the parties dispute whether the hearing examiner could reasonably rely on Dr. Bienz's testimony to support this finding. Salas notes that the hearing examiner found that he and Dr. Bienz were credible witnesses, and argues that their testimony comprises substantial evidence to support the hearing examiner's finding. According to Salas, the district court essentially reweighed the evidence in reaching a contrary conclusion. General Chemical contends that Dr. Bienz's testimony did not establish that the May 1999 accident materially aggravated the pre-existing degenerative condition in Salas' right knee, but does not otherwise challenge the hearing examiner's findings as to witness credibility.

[¶ 14] Dr. Bienz testified, in pertinent part, as follows:

> Q. [General Chemical counsel] And do you recall when the first time it was you saw Mr. Salas?
>
> A. With the benefit of the record, I do. That would be on October 25, 1999.
>
> Q. And Mr. Salas, when you first saw him, was complaining of what you describe as acute on chronic right knee pain; is that correct?
>
> A. That is correct.
>
> Q. What do you mean by acute on chronic right knee pain?
>
> A. It means he is suffering from a preexisting condition with an acute exacerbation. In other words, he is having pain in an extremity that he has had before, but worse than previously.
>
> * * *
>
> Q. And what did your physical examination of Mr. Salas find?
>
> A. He had full range of motion of the knee. He did have medial out of joint line pain and provacative tests on examination of the knee also suggested medial-sided joint line pain.
>
> Q. Do you have an opinion as to what was causing that pain for him?
>
> A. Now or at that time or—
>
> Q. Well, how about—yeah, now.
>
> A. Okay. Yes. I believe it was secondary to degenerative changes in the medial

compartment, along with—actually, primarily due to degenerative changes in the medial compartment. At the time I thought that maybe it had to do with a medial meniscus tear as well, and apparently after the procedure it appears it was most likely due to both.

[Salas counsel]: Doctor, what did you say? Most likely due to both?

A. Due to both, yes. The medial meniscus tear as well as the degenerative change.

Q. [General Chemical counsel] What do you mean when you say most likely due to both?

A. In other words, the pain that he was experiencing was most likely attributable to both, that the degenerative change in the medial compartment—that is, loss of articular cartilage and bone-on-bone. contact, as well as a degenerative tear in the meniscus.

\* \* \*

Q. And in the preoperative diagnosis, you described left knee degenerative joint disease with possible medial meniscus acute injury?

A. Uh-huh.

Q. What are you referring to in regard to the acute injury?

A.... And what I'm referring to by acute injury is an injury that is a recent injury as opposed to something which is chronic that is an old injury.

Q. And you use the word possible, why do you use the word possible?

A. Preoperative diagnosis suggests the plan or supposition on the initial evaluation, that is, findings that are thought to be present before seeing them on the arthroscopic evaluation.

\* \* \*

Q. Okay. And postoperatively, was it still your opinion that there was a possible medial meniscus acute injury in that right knee?

A. It appeared that there was primarily degenerative medial meniscus tear with significant cartilage degeneration.

\* \* \*

Q. [Salas counsel] Sure. Sure. You have initial diagnosis of acute on chronic injury?

A. Yes.

Q. Do you still carry that opinion today?

A. I do.

Q. Okay. So is it fair to say, to a reasonable degree of medical probability, you feel that the work-related incident that Mr. Salas described caused an aggravation of his preexisting condition?

A. Yes.

\* \* \*

Q. Doctor, you indicated that you found degenerative condition in the knee upon arthroscopy, as well as a—what you defined as degenerative tear—

A. Yes.

Q. —of the meniscus?

A. Yes.

Q. Do you have an opinion—or could you tell from the arthroscopy whether that meniscus tear was caused by this incident?

A. No, that's harder to assess. The medial meniscus was quite minimal in its quantity and degenerative in its quality. That is consistent with the previous history that Dr. Herrington reported that he performed meniscectomy. I do not agree with the IME suggesting meniscectomy, because there was some remnant of the meniscus there. It is very hard to assess, however, whether the tear was acute or chronic, but I will say that it had more of a character of degenerative-type tear, that is it was fibrillated with fraying, there was no specific split that went into the meniscus and traveled along its circumference, so it did look more degenerative than acute.

\* \* \*

Q.... Do you have an opinion that there was degenerative changes in this remnant of a meniscus in Mr. Salas's knee prior to the May 3, 1999 work-related accident?

[objection omitted]

A. Based upon the degree of the articular cartilage loss, I would say there was most[ ] likely degenerative changes in the medial compartment for quite some time, including the meniscus.

Q. . . . Okay. Doctor, you're unable, diagnostically or objectively, to determine whether this work-related accident of 5/3 of 1999 caused or accelerated the tear of the meniscus?

[objection omitted]

* * *

A. As far as objectively or diagnostically includes a very large breadth of possibilities, so I would say that, yes, I can make some statement to that effect. Objectively, based upon findings in the arthroscopy, it appears he had degenerative changes that probably predated the injury and yet the examination I performed on him with his conclusion that previously he had very minimal pain and subsequently he had rather significant pain that is also included in the object—in the diagnostic findings, and I would suggest he did have an exacerbation of the injury.

Q. So you're basically saying, based upon the history of increased pain in the area of the meniscus, led you to your opinion that there was an aggravation of a preexisting condition caused by the May 3, 1999 work-related accident?

A. That's correct. Exacerbation of his condition, not necessarily of a specific meniscus injury, though.

* * *

Q. Doctor, do you feel that the work-related incident to Mr. Salas described was consistent with the injury [you] diagnosed and treated?

[objection omitted]

A. I agree that the injury, which he described to me that occurred . . . can cause the types of symptoms that he was complaining of.

* * *

A. . . . I do not believe that it would cause degeneration of the knee, and that's why I diagnosed it as an acute on chronic injury.

* * *

A. . . . You're saying would I be able to attribute the need for arthroplasty to his injury—to the injury of May?

Q. Of that May 1999 injury.

A. Only from the point of view that he had no complaints before and he complains—or he had no specific acute complaints before, but he had greater complaints then, but as far as degeneration, most of the degeneration was probably present before that injury.

Q. Okay. Do you think that this acute injury that's been described has accelerated the degenerative process?

A. That's hard to say, because I only . . . saw his knee one time. I did not see it before. I can only say it caused him to have more pain.

Q. So it would be difficult, you're saying, to attribute any accelerated degenerative changes as a result of the May 1999 work-related accident?

A. That's true.

Dr. Bienz also disagreed with Dr. Jones' opinion in one significant respect:

Q. [Salas counsel:] Okay. And under the causation section, Dr. Jones indicates that in the first paragraph, based upon the available information, to reasonable degree of medical certainty, there is not a causal, excuse me, relationship between the examinee's current complaints and reported injury of 5/3/99. And I assume from your previous testimony, you disagree with that at the same time?

A. That's correct.

Q. Okay. And the basis for your disagreement is what, Doctor?

A. The fact that the patient reported to me that he had a pain-free injury prior to that injury, and subsequent to the injury had recurrence of preexisting pain.

[¶ 15] We conclude that, after reviewing the entire record pursuant to the requisite standard of review, the record contains substantial evidence that Salas' May 1999 work accident contributed to a material degree in aggravating or combining with the pre-existing degenerative condition in Salas' right knee, and necessitated the March 2000 right knee arthroscopy; therefore, we cannot substitute our judgment for that of the hearing examiner. We also cannot find that it was unreasonable for the hearing examiner to accept Dr. Bienz's expert medical testimony

regarding the May 1999 accident's role in "exacerbating" or "aggravating" the pre-existing degenerative condition in Salas' right knee, especially considering that "the hearing examiner is in the best position to judge and evaluate the expert witnesses and their opinions." *Frazier*, 997 P.2d at 491.

[¶ 16] Salas testified that after a doctor aspirated fluid from his right knee in May 1998, the knee "felt fine" and he "had no other problems" except that when he completed four or five days of work, he experienced periodic "soreness," but not "constant pain." Indeed, the doctor who performed the 1997 arthroscopy of Salas' knee stated that the right knee would be "sore" for a "considerable time" but "eventually should be a reasonably good knee." After a physical in which another doctor noted right knee pain along "the medial aspect," the same doctor noted that as of December 1998, Salas' right knee was feeling "much better with [medication.]"

[¶ 17] The record does not reveal any other incidents or reports of, or medical treatment for, right knee pain between December 1998 and May 3, 1999. On May 3rd, Salas was involved in the above-described accident at work. Within a month or so thereafter, Salas experienced first a "clicking" in his right knee and then a "constant pain" that he had not experienced prior to the accident, to a degree that he "curtailed a lot of [his] other activities." Dr. Bienz testified that the May 1999 injury Salas described to him "can cause the types of symptoms [Salas] was complaining of" shortly after the accident.

[¶ 18] As Salas' "constant pain" became "progressively" worse, Dr. Bienz initially attempted to treat Salas with physical therapy and medication,[2] but noted that if Salas continued to have discomfort at "six weeks ... consideration will be given to arthroscopy and debridement." By November 1999, Salas had experienced some "good relief of pain" with the physical therapy and medication, although he still suffered knee pain, snapping and popping, which Dr. Bienz con-

firmed with further examination. Dr. Bienz then "recommended" and performed the right knee arthroscopy for "diagnostic and therapeutic purposes to evaluate and possibly treat the knee." The degenerative changes in Salas' right knee likely occurred prior to May 1999, but in addition to recommending the arthroscopy for diagnostic and therapeutic purposes, Dr. Bienz was able to attribute the need for the arthroscopy in part due to the May 1999 accident because of the pain-specific history Salas provided; Salas lacked "specific acute complaints before, but he had greater complaints" following the accident.

[¶ 19] Dr. Bienz diagnosed Salas with "acute on chronic right knee pain," and the doctor maintained that diagnosis as of the date of his deposition testimony. In other words, according to Dr. Bienz, Salas suffered from "a preexisting condition with an acute exacerbation." Dr. Bienz testified consistently, unequivocally, and to "a reasonable degree of medical probability" that while the May 3, 1999, accident did not cause or appear to accelerate the degenerative changes that existed in Salas' right knee at the time of the accident, the accident did cause an "exacerbation" or "aggravation of his preexisting condition." The doctor's opinion was based on his examination of Salas, and Salas having experienced "very minimal pain" prior to the accident and "rather significant pain" subsequent to the accident. Dr. Bienz expressly disagreed with Dr. Jones' opinion for this reason.

[¶ 20] Dr. Bienz's medical opinion was relevant to determining whether the May 1999 accident materially aggravated the pre-existing degenerative condition in Salas' right knee, and constituted evidence that a reasonable mind might accept in support of the hearing examiner's finding on that issue. General Chemical does not argue that Dr. Bienz's testimony was speculative, but rather that Dr. Bienz actually narrowed or qualified his general statements regarding the accident's aggravation of Salas' pre-existing condition because he subsequently testified that Salas' medial meniscus tear appeared to be

---

**2.** According to Dr. Bienz, "[p]hysical therapy can be quite beneficial to patients almost regardless of what their diagnosis is" and if "somebody's getting better with nonoperative intervention, usually we stay the course...."

degenerative. However, Dr. Bienz's opinion appears to be that, ***despite*** the fact that the degenerative changes in Salas' right knee likely occurred prior to the May 1999 accident, the doctor's examination, and the pain-specific history Salas provided, confirmed his "acute on chronic" pain diagnosis; the May 1999 accident "acutely" aggravated or exacerbated the pre-existing degenerative condition in Salas' right knee.

[¶ 21] In support of its argument, General Chemical also places particular emphasis on our decision in *Brees,* 6 P.3d at 131. In *Brees,* 6 P.3d at 130, Dora Brees claimed "to have sustained a back injury" at work. On appeal, Brees did not dispute that she had a pre-existing back condition, but argued that her doctor's testimony established that her work injury materially aggravated the pre-existing condition. *Id.* at 131. We concluded that

> Dr. Metz' testimony does not establish whether Brees materially aggravated her previous condition ... because Dr. Metz was never directly asked whether Brees' surgery resulted from the pre-existing condition or from twisting and pushing the cart. As a consequence, Brees has not presented any evidence on the question of whether the back pain experienced when twisting and pushing the cart ... materially aggravated her pre-existing condition and resulted in a compensable injury.

*Id.* at 133. Yet, in the instant case, Dr. Bienz not only was able to attribute the need for arthroscopy in part due to the May 1999 accident, but also opined "to a reasonable degree of medical probability" that the accident aggravated or exacerbated Salas' pre-existing degenerative knee condition.

[¶ 22] The circumstances of the instant case are similar to those contained in *Roggenbuck,* 938 P.2d at 853. In that case, the claimant had

> a history of back problems, scars from two previous back surgeries, and a permanent partial disability of 60 percent, [and] alerted his employer of a work-related injury to his back incurred nine days into his new employment.

*Id.* at 853. Further,

> [m]edical evidence included a statement by the doctor treating claimant since January

of 1991 that 50 percent of claimant's current condition was due to the instant injury. This percentage included the normal aging process and normal daily living activities. A comparison of an MRI report after the accident to one performed two and a half years earlier indicates a significant deterioration and worsening of claimant's condition.

> It is true that claimant and his doctor discussed surgery before the work-related injury, however notes from claimant's doctor indicate that discussion took place over a two and a half year period before the last injury. As pointed out by the hearing examiner in Finding No. 5, it was the "work effort [that] brought the need for surgery to a head and forced the surgery to be done at this time." Further, testimony indicated that the pain levels experienced by claimant increased after the injury; and, when taken as a whole, the evidence supports the hearing examiner's conclusions that the work efforts on behalf of the employer contributed to a material degree to the precipitation, aggravation or acceleration of his preexisting condition to the point that surgery could no longer be avoided.

*Id.* at 853–54. Accordingly, we affirmed the hearing examiner's findings and his decision awarding the claimant benefits.

[¶ 23] Having found substantial evidence to support the hearing examiner's findings in the instant case, we reverse the district court's decision, and affirm the hearing examiner's decision awarding Salas benefits.