99 P.3d 445 (2004)
2004 WY 116
In the Matter of the Worker's Compensation Claim of Jerry ARMIJO, an Employee of TP Enterprises, Inc.
State of Wyoming, ex rel., Wyoming Workers' Safety and Compensation Division, Appellant (Petitioner),
v.
Jerry Armijo, Appellee (Respondent).
No. 03-170.
Supreme Court of Wyoming.
October 20, 2004.
*447 Representing Appellant: J.C. DeMers, Special Assistant Attorney General.
Representing Appellee: Michael K. Kelly, Laramie, Wyoming.
Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.
HILL, Chief Justice.
[¶ 1] The Wyoming Workers' Safety and Compensation Division (Division), challenges an order of the district court that affirmed a decision of the Office of Administrative Hearings (OAH) awarding benefits to an injured worker, Jerry Armijo (Armijo). The Division contends Armijo did not meet his burden of showing that he was injured in the course and scope of his employment, and/or that his injury was a preexisting condition. We will affirm.

ISSUES
[¶ 2] The Division provides this statement of the issues:
Did the hearing examiner commit an error of law by failing to require [Armijo] to meet his clearly established burden of proof that the alleged work injury was a result of a work incident on April 11, 2002, and not the result of a pre-existing condition?
Is the decision of the hearing examiner arbitrary, capricious or an abuse of discretion?
Did the hearing examiner commit an error of law by failing to apply the proper burden of proof by not requiring [Armijo] to prove the cause of his herniated discs within a reasonable degree of medical probability?
Is the decision of the hearing examiner supported by substantial evidence?
Armijo summarizes the issue thus:
Whether the hearing examiner's determination that [Armijo] met his burden of proof regarding the cause and compensability of his injury was supported by substantial evidence and was not otherwise arbitrary, capricious or not in accordance with Wyoming law.

FACTS
[¶ 3] Armijo reported to his foreman at work that he injured his neck while on the job on April 11, 2002. TP Enterprises in Laramie employed Armijo. Tony Peters owned TP Enterprises, and his wife Alicia Peters also worked in that business. Armijo's foreman informed Tony Peters of that injury, and his response was "so what?" Armijo filed an employee's report of injury on April 15, 2002, indicating that he was injured while on the job on April 11, 2002.[1] Alicia Peters signed the report for the employer and indicated that the injury occurred on the job. Armijo sought worker's compensation benefits for what he claimed was an on-the-job injury to his neck.
[¶ 4] By letter dated May 2, 2002, the Division informed Armijo of the status of his claim for benefits:

*448 The Workers' Compensation Division has reviewed your case file and has determined that we cannot approve payment of benefits.
The preponderance of evidence supports that the symptoms occurred at home while raking leaves, and not at work. Wyoming Statute XX-XX-XXX(a)(xi).[2]
[¶ 5] Armijo asked for a hearing on his claim for benefits and one was scheduled for August 27, 2002. In its pre-hearing disclosure statement, the Division alleged both that the injury did not occur at work and that Armijo had a preexisting condition (injury to his neck of long-standing).
[¶ 6] Wendy Romero testified that she was Armijo's girlfriend, that they had three children together, and they shared a common household. They had been together for 14 years. She further related that Armijo came home from work on April 11, 2002, complaining about neck pain. Armijo did not go to work the following day and spent that day resting on the couch. On April 13, 2002, Armijo was using a hose with a nozzle attached to clean off his driveway when he got a spasm in his neck that was so intense that he dropped the hose. He drove himself to the emergency room at Ivinson Hospital for treatment. Armijo also testified that although he had problems with his lower back, he had never before had problems with his neck. Exactly how Armijo injured his neck and the nature of that injury were contested at the hearing. Much of the relevant evidence was submitted to the hearing officer in the form of exhibits. Both parties submitted exhibits and both parties stipulated that all exhibits could be admitted. There was no medical testimony offered at the hearing, though many of the exhibits were from medical personnel.

STANDARD OF REVIEW
[¶ 7] Our standard of review when reviewing administrative agency action was *449 clarified and refined in the case of Newman v. State ex rel. Workers' Safety and Compensation Division, 2002 WY 91, ¶¶ 7-26, 49 P.3d 163, ¶¶ 7-26 (Wyo.2002). That case held that "the substantial evidence test is the appropriate standard of review ... when factual findings are involved and both parties submit evidence." Id., ¶ 22. In appeals where both parties submitted evidence at the hearing below and the dispute is over the soundness of the factual findings of the agency, Newman mandates the appellate review be limited to application of the substantial evidence test. This is true regardless of which party appeals from the agency decision. The substantial evidence test provides: "In reviewing findings of fact, we examine the entire record to determine whether there is substantial evidence to support an agency's findings. If the agency's decision is supported by substantial evidence, we cannot properly substitute our judgment for that of the agency and must uphold the findings on appeal. Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. It is more than a scintilla of evidence." Id., ¶ 12 (citing State ex rel. Wyoming Workers' Safety and Compensation Division v. Jensen, 2001 WY 51, ¶ 10, 24 P.3d 1133, ¶ 10 (Wyo. 2001)).
When factual findings are challenged, we will affirm those findings if they are supported by substantial evidence.
In contested cases conducted before administrative agencies, the deference that normally is accorded the findings of fact by a trial court is extended to the administrative agency, and we do not adjust the decision of the agency unless it is clearly contrary to the overwhelming weight of the evidence on record. Mekss [v. Wyoming Girls' School, State of Wyoming, 813 P.2d 185 (Wyo.1991)]; State ex rel. Wyoming Workers' Compensation Div. v. Brown, 805 P.2d 830 (Wyo.1991). This is so because, in such an instance, the administrative body is the trier of fact and has the duty to weigh the evidence and determine the credibility of witnesses. Gilmore v. Oil and Gas Conservation Comm'n, 642 P.2d 773 (Wyo.1982).

Wyoming Steel & Fab, Inc., 882 P.2d at 875.
Newman, ¶ 26, also see Ludwig v. Wyoming Workers' Safety and Compensation Division, 2004 WY 34, ¶¶ 5-7, 86 P.3d 875, ¶¶ 5-7 (Wyo.2004); and Loomer v. Wyoming Workers' Safety and Compensation Division, 2004 WY 47, ¶ 15, 88 P.3d 1036, ¶ 15 (Wyo.2004).
[¶ 8] This additional refinement of our standard of review is pertinent in this matter:
We also need to premise our discussion with an acknowledgment that all of the witnesses who testified, and all other evidence introduced at the hearing, clearly established that there were no "eye-witnesses" to Ikenberry's accident. At no time in his reports of the accident, in his narration of the accident to his treating physician, nor in his own live testimony at the hearing, did he make a claim that anyone saw the accident occur. The testimony of an injured worker alone is sufficient to prove an accident if there is nothing to impeach or discredit the worker's testimony and the worker's statements are corroborated by surrounding circumstances. Duncan v. Hardware Mutual Casualty Company, 275 So.2d 462, 463 (La.App.1973). Moreover, the occurrence of injuries resulting from accidents to which there are no eye-witnesses does not prevent fair inferences from being drawn and findings of facts from being made. Bohan v. Lord & Keenan, Inc., 98 N.H. 144, 95 A.2d 786, 788 (1953).
Ikenberry v. State ex rel. Wyoming Workers' Compensation Division, 5 P.3d 799, 803 (Wyo.2000). Moreover, demonstrating evidentiary contradictions in the record does not establish the irrationality of the ruling, but we do examine conflicting evidence to determine if the agency reasonably could have made its finding and order based upon all of the evidence before it. Lunde v. State ex rel. Wyoming Workers' Compensation Division, 6 P.3d 1256, 1259 (Wyo.2000). Also see Pino v. Wyoming Workers' Safety and Compensation Division, 996 P.2d 679, 685 (Wyo.2000) ("Testimony by the medical expert to the effect that the injury "most likely," *450 "contributed to," or "probably" is the product of the workplace suffices under our established standard."); and Thornberg v. Wyoming Workers' Compensation Division, 913 P.2d 863, 867 (Wyo.1996) ("Generally, when a single incident is alleged to have caused an injury, medical testimony is not required if it is not essential to establish a causal connection between the occurrence and the injury.").

DISCUSSION
[¶ 9] The evidence in this case was, indeed, very much in conflict, if not downright contradictory. The hearing officer was called upon to resolve several very significant contradictions. The Division characterizes many of these contradictions as "fabrications" and "lies," but under the applicable standard of review that is a role played by the hearing officer and not by the district court nor by this Court. We also take note at the outset that the record is fairly short. There were no physician witnesses at the hearing; only Armijo's treating physician provided evidence (in the form of responses to written questions propounded by Armijo) that was directly related to the injury at issue. The only witness who testified on behalf of the Division at the hearing was the bookkeeper for Armijo's employer, Alicia Peters.
[¶ 10] The status of Armijo's medical condition was not disputed. The Division's claims are that the neck injury either did not occur in the course and scope of Armijo's employment, or that it was a preexisting condition and Armijo failed to meet his burden of proof with respect to an injury suffered in light of a preexisting condition. It is not disputed that there was no eyewitness to Armijo's injury. Armijo claimed that he injured his neck while carrying a heavy scaffold plank when he was at work, and Armijo informed both his foreman and his employer's bookkeeper that he had suffered such an injury. Armijo's foreman reported the injury to their employer at the time Armijo reported it to him. Both Armijo and the foreman testified at the hearing to these facts.
[¶ 11] Armijo also presented this piece of evidence in support of his claim (questions propounded in writing to Lawrence A. Jenkins, M.D., Armijo's treating physician):
Question 1  Could you briefly state the nature of the injury to Mr. Armijo's neck?
Large cervical disc herniation  surgery recommended but declined by patient.
Question 2  Mr. Armijo has claimed that he injured his neck while lifting and carrying planks for scaffolding while on his job site. This injury is claimed to have occurred on a Thursday. He will testify he rested on Friday, and, while doing yard work on Saturday, had such pain that he was forced to go to the Emergency Room for treatment. It is anticipated that the Workers' Compensation Division will claim that Mr. Armijo actually injured his neck while raking leaves that Saturday morning. Given the nature of this injury, in your medical opinion, what do you feel is the more likely cause of this injury?
Large herniation typically seen when lifting heavy objects especially overhead. Not usually seen due to activities such as raking but anything is possible.
[¶ 12] This is important because the employer contends Armijo told others that the onset of his pain occurred while he was raking leaves in his yard. Armijo testified that he could not explain why others would say he was raking leaves because he lived in a double-wide trailer, had no trees or bushes in his yard, there were no leaves to rake at his home, and he did not own a rake. Armijo's girlfriend confirmed those facts.
[¶ 13] Armijo testified that he had experienced back pains during his 20-22 year career working in construction, but had never had problems with his neck. Armijo's girlfriend testified that she could not recall her boyfriend having trouble with his neck. The Division produced notes taken during Armijo's visit to the emergency room on April 13, 2002, and they provided this information: "neck stuck since this AM when raking leaves feels cramps [with] any movement has seen doctors in past who say this is a pinched nerve;" and "6 months of neck problems." A follow-up visit to the hospital on April 14, 2002, produced these notes:

*451 The patient was seen in the emergency department yesterday with the acute onset of neck pain involving the left posterior neck and trapezius area, which is incapacitating and causes radiation of pain to his arm. He has some chronic neck problems on and off for the last year but has never had pain to this degree. The pain was incapacitating and required an injection of Demerol. Since then he has had no real relief in spite of taking approximately 16-20 Percocet over the past 24 hours. He presents for further evaluation and care. He is obviously quite uncomfortable. He does do construction work but has no specific injury that he can recall.
A follow-up visit to the hospital on April 16, 2002, had similar results:
The patient has been seen in the emergency department twice in recent days with complaints of severe, incapacitating neck pain radiating to his shoulders. This has been going on for several months. He has finally gotten an MRI today, which reveals a significant disc injury with thecal impingement at the C5-6 level. He has been on Percocet and has run out of pain medication. He is now having intractable pain. He notes moderate relief with a soft cervical collar when he uses it. He has been unable to work for the last two months on and off due to this pain and has been quite resistant about having it adequately treated.
....
Past medical history is significant for recurrent neck pain with no known injury.
[¶ 14] Armijo was referred to Dr. Jenkins but declined surgical intervention. Dr. Jenkins' clinical notes included this information:
HISTORY: Jerry Armijo comes in today for evaluation, he is referred by the Ivinson Memorial Hospital Emergency Room. He has been followed there since reporting there on 04/13 complaining of severe neck pain and arm pain. He was lifting a large plank at work when he had the severe onset of pain in his neck, radiating down the arms. He has had intermittent symptoms of arm pain for quite some time. He was seen by Dr. Bienz a couple of months ago, in this office, with a trigger finger, and he was having arm pain at that time too. He has been receiving PERCOCET through the emergency room, and he acknowledges that he takes upwards of 12-14 a day. He was just recently started on a MEDROL DOSEPAK, which he has just started today, he is off work.
PAST MEDICAL HISTORY: History of back and neck problems as before.
....
DIAGNOSTICS: X-rays: X-rays are not available. Those taken actually in January reveal just some degenerative changes at 6-7. MRI scan: A MRI scan of the cervical spine taken 2 days ago, reveals a large extruded C5-6 disc with significant thecal sac impingement. He has a smaller disc protrusion at 6-7 as well.
Dr. Jenkins' plan of treatment recommended surgery, but "if he wants to continue on conservative management that is absolutely fine." Dr. Jenkins also determined that Armijo was temporarily totally disabled.

The Hearing Officer's Order Awarding Benefits
[¶ 15] The Division comprehensively challenges the inadequacy and incompleteness of the hearing officer's findings and conclusions. We set them out in their entirety here:
FINDINGS OF FACT
1. The issue before this Office is whether Armijo suffered a compensable injury. Armijo alleged he suffered an injury to his neck carrying a scaffold plank while working for TP on April 11, 2002. The Division alleged Armijo's neck problems were the result of raking leaves at home and not the result of his work at TP.
2. Armijo has worked in construction for 20 to 22 years and has worked for TP off an on for the last four years. While working at TP Armijo performed various job duties including scaffolding and mixing mud [stucco].
3. Near the end of his work shift on April 11, 2002 Armijo was carrying scaffolding planks. While walking to the truck with a 12-foot long, 50-pound plank balanced on his left shoulder, Armijo began having neck pain. Armijo testified he reported *452 the neck pain to his foreman Milo Sisneros (Sisneros). According to Armijo, Sisneros said he would let the owner, Tony Peters (Peters) know about the pain Armijo was experiencing in his neck.
4. Sisneros submitted a letter dated July 17, 2002 stating he was Armijo's foreman on April 11, 2002 and that Armijo stated his neck hurt from lifting planks. The letter indicated Sisneros called Peters, advised Peters of Armijo's neck pain and Peters responded: "So what." Exhibit 4.
5. At hearing, Sisneros testified he worked for TP for almost four years and was a foreman for the last two years. Sisneros stated he did not see any injury to Armijo but confirmed Armijo did tell him about neck pain from loading scaffolding into the truck. Sisneros confirmed he called Peters, advised Peters of Armijo's neck pain and was told "so what." Sisneros stated he wrote the July 17, 2002 letter three months after Armijo's neck pain and one month after leaving employment with TP. Sisneros did not witness Armijo suffer an injury to his neck but told Armijo to notify Tony or Alicia Peters (Alicia) within 72 hours of seeking medical treatment.
6. Armijo testified he woke up on April 12, 2002 with neck pain, called Peters and told Peters he would not be in to work because of his neck pain. Armijo spent the day at home resting and denied taking his family to Cheyenne on April 12, 2002.
7. On April 13, 2002 Armijo was spraying mud off his driveway with a hose when he experienced neck spasms. Armijo dropped the hose and drove himself to the hospital. According to Armijo, Lance Talbot (Talbot) was present when Armijo experienced the neck spasms. Talbot wrote a statement dated May 10, 2002 indicating he saw Armijo on April 13, 2002 watering the lawn. Talbot stopped to check on Armijo at which time Armijo complained of neck pain. Talbot indicated Armijo looked like he was in pain and that Armijo left to go the hospital. Exhibit 13.
8. After experiencing severe neck spasms, Armijo drove to the Ivinson Memorial Hospital emergency room in Laramie, Wyoming and sought medical treatment. The April 13, 2002 note from the emergency room nurse reflected Armijo gave a history of his neck being immobile that morning while raking leaves. Armijo stated he had been having neck pain for six months and that the doctors he had seen in the past told him he had a pinched nerve. Exhibit S-B, p. 1 and Exhibit 9, p. 1. Dr. Ty Battershell, M.D., saw Armijo in the emergency room on April 13, 2002. Dr. Battershell's note indicated Armijo had neck pain, which worsened that morning while raking leaves, and that Armijo had experienced prior neck problems. Exhibit S-B, p. 9 and Exhibit 9, p. 4.
9. Wendy Romero (Romero) is Armijo's girlfriend and mother of their three children. According to Romero, their trailer home does not have any trees or bushes and that they do not own a rake. Romero stated Armijo came home from work on April 11, 2002 complaining of neck pain and that Armijo stayed home on April 12, 2002 and rested. Romero denied Armijo drove the family to Cheyenne on April 12, 2002. Romero did not recall Armijo having any neck pain prior to April 11, 2002 or that Armijo had x-rays of his neck taken in January 2001. Romero stated Armijo did not have any real medical problems but that Armijo may have complained of back pain in the past.
10. Armijo returned to Ivinson Memorial Hospital's emergency room on April 14, 2002 and was treated by Dr. Donald Cantway, M.D. Dr. Cantway's treatment notes reflected Armijo had been seen the previous day for an acute onset of neck pain with pain radiating into the arm. The notes also indicated Armijo had a history of prior neck pain and that Armijo had chronic neck problems off and on for the last year. Exhibit S-C.
11. On April 15, 2002 Armijo signed a report of injury that had been filed out by Romero. The report stated Armijo was hauling a 12-foot plank to the truck on his left shoulder when he hurt his neck. The report indicated the employer was notified on April 13, 2002 when Armijo called Peters. Alicia signed the report on April 16, 2002 and indicated the injury was work-related. *453 Exhibit S-A, p. 2 and Exhibit 1, p. 2. Alicia confirmed she signed the report when Romero brought it to her house on April 16, 2002.
12. On April 16 2002, an MRI of Armijo's neck was performed. The MRI revealed herniated discs at C5/6 and C6/7. Exhibit 7. On April 16, 2002, Dr. Cantway again saw Armijo and the treatment notes of that date reflected incapacitating neck pain radiating into the shoulder which has been on going for several months. The notes also reflected that Armijo stated he was unable to work off and on the last two months due to neck pain. Exhibit S-D, p. 1.
13. On April 18, 2002 Armijo was seen by Dr. Lawrence A. Jenkins. The office note of that date reflected a history of Armijo lifting a plank and severe onset of neck pain and that Armijo had intermittent symptoms of arm pain for some time. The note indicated Armijo had been seen by Dr. Bienz a couple of months earlier for another problem and was having arm pain at that time. Dr. Jenkins noted Armijo had a history of prior back and neck problems and that x-rays in January 2001 revealed degenerative changes at C-7. Exhibits S-E and 8.
14. Alicia signed a second report of injury on April 24, 2002. Alicia described an injury to Armijo on April 11, 2002 as tweaked neck while carrying a plank. On this report Alicia put a question mark after the question asking if the injury was work-related. Exhibit 2.
15. Alicia also sent a letter to the Division dated April 23, 2002. The letter stated Armijo did not tell anyone on the job site about an injury, that Armijo drove his family to Cheyenne on April 12, 2002 and that Armijo was raking his yard on April 13, 2002 when his neck became sore. Exhibits S-F and 5. Alicia testified the information about Armijo driving to Cheyenne and raking came from a phone call with Armijo on the morning of April 16, 2002.
16. In an April 26, 2002 letter, Dr. Jenkins indicated Armijo had two herniated discs, that surgery was needed and that Armijo declined the surgery. Dr. Jenkins prescribed pain medication. Exhibit 6. In a May 2, 2002 letter Dr. Jenkins stated he last saw Armijo on April 26, 2002 and that Armijo was given pain medication. On May 2, 2002 Dr. Jenkins indicated he would not give Armijo any more pain medication because Armijo has a significant history of obtaining pain medications from different doctors. Exhibit S-G.
17. Armijo testified Dr. Jenkins advised of the need for surgery and that Armijo did not want surgery. Armijo sought treatment with Dr. Ribnik in Cheyenne for pain management. According to Armijo he is still in pain but Dr. Ribnik's treatment is helping with the pain.
18. Armijo admitted having back problems a few years ago but denied having any neck pain prior to April 11, 2002. Armijo stated he was not aware of any prior treatment to his neck and did not know why the report from Dr. Jenkins on April 18, 2002 indicated prior x-rays of the neck revealed degenerative changes or why the report contained a history of prior back and neck problems. Armijo did not know why the emergency room nurse's note on April 13, 2002 stated he was raking leaves or why it said he had seen a doctor in the past who said the pain was from a pinched nerve. Armijo denied telling Dr. Cantway about neck problems on and off for the last year and does not know why the notes from Dr. Cantway do not mention any work injury.
19. On August 23, 2002 counsel for Armijo sent a letter to Dr. Jenkins asking the doctor to respond to a couple of questions. Dr. Jenkins stated Armijo's injury to the neck was the result of herniated discs, that surgery was recommended and that Armijo declined surgery. Dr. Jenkins stated the large herniations were typically seen after lifting heavy objects and especially with lifting overhead. Dr. Jenkins also stated herniations are not usually seen as a result of outside activities like raking but anything is possible.
20. The evidence in this case is somewhat conflicting as the medical records from the emergency room indicated Armijo's neck pain occurred when raking at *454 home while Armijo and Romero denied having a rake or having anything to rake at their home. Despite this conflict the evidence established Armijo reported neck pain from lifting a plank on April 11, 200[2], while at work for TP. The medical records from Dr. Jenkins reflected the history of lifting a plank at work and resulting in neck pain. Additionally, Dr. Jenkins stated the large herniations found in the MRI are typically seen after lifting heavy objects and especially overhead lifting. Benefits should be awarded.

CONCLUSIONS OF LAW
1. Armijo has the burden of proving all the statutory elements which comprise a "compensable injury." Matter of Workers' Compensation Claim of Thornberg, 913 P.2d 863 (Wyo.1996) and Workers' Compensation Claim of Jacobs, 924 P.2d 982 (Wyo.1996). This burden includes establishing the cause of the condition for which compensation is claimed and that the injury arose out of and in the course of the employment. See Wyo. STAT. ANN. § 27-14-102(a)(xi) (LEXIS 2001). State ex rel. Workers' Compensation v. Espinoza, 924 P.2d 979, 981 (Wyo.1996) citing Baker v. Wendy's of Montana, Inc., 687 P.2d 885, 892 (Wyo.1984). In this case Armijo must establish his neck pain is the result of his work effort for TP.
2. Armijo has the burden of establishing each and every statutory element by a preponderance of the evidence. Thornberg, 913 P.2d at 866 and Jacobs, 924 P.2d at 984.
A "preponderance of the evidence" is defined as "proof" which leads the trier of fact to find that the existence of the contested fact is more probable than its non-existence." Scherling v. Kilgore, 599 P.2d 1352, 1359 (Wyo.1979).

Thornberg, 913 P.2d at 866. The evidence presented is not to be liberally construed in a claimant's favor when determining if an injured worker has met that burden of proof. Matter of Fansler, 914 P.2d 156 (Wyo.1996).
3. Armijo has met his burden. The evidence in this case established Armijo was working for TP on April 11, 200[2], when he began experiencing neck pain. Armijo reported the neck pain to his supervisor and the supervisor reported it to Peters. An MRI found two herniated discs and Dr. Jenkins stated the large herniations found in the MRI are typically seen after lifting heavy objects and especially with overhead lifting. Benefits are therefore awarded.
[¶ 16] On October 25, 2002, the Division filed a petition for review in the district court. That petition contained this statement of "Specific Issues of Law:"
Did the Hearing Examiner commit an error of law by failing to apply the proper burden of proof by not requiring the Employee to prove the cause of his herniated discs within a reasonable degree of medical probability?
Did the Hearing Examiner commit an error of law by failing to require the Employee to meet his clearly established burden of proof that the alleged work injury was a result of a work incident on April 11, 2002, and not the result of a pre-existing condition?
Did the Hearing Examiner violate the Administrative Procedures Act by failing to make specific findings of fact necessary to support his ultimate conclusions?
Did the Hearing Examiner abdicate his responsibilities as a fact finder by failing to make any credibility determinations and failing to set forth in detail how he resolved directly contradictory evidence so as to allow reasonable review by a Court?
Is the decision of the Hearing Examiner supported by substantial evidence?
Is the decision of the Hearing Examiner arbitrary, capricious or an abuse of discretion?[3]
[¶ 17] On November 13, 2002, the Division sought an order from the district court staying the payment of any further worker's compensation benefits to Armijo. Finding *455 that Armijo would be irreparably harmed by the grant of such a motion, the district court denied the motion.
[¶ 18] On June 18, 2003, the district court issued a decision letter[4] affirming the order entered by the hearing examiner. The district court summarized the evidence that it viewed as the "substantial evidence" that supported the hearing examiner's findings. The district court concluded:
Medical testimony is not required to establish a causal connection between the occurrence and the injury when it is not essential. Thornberg v. State of Wyoming Worker's Comp. Div., 913 P.2d 863, 867 (Wyo.1996). The hearing examiner had the responsibility of determining relevancy, assigning probative value, and ascribing weight to be given to any of the doctor's testimonies. Id. The hearing examiner made certain findings of fact after listening and weighing all of the evidence. Though there may be evidence within the record supporting the Division's position, the Court must view all evidence in a light most favorable to [Armijo], the prevailing party. The Court finds the record contains substantial evidence to support the findings made by the hearing examiner, and there is no indication he was arbitrary or capricious or abused his discretion in any way. "It is the burden of the party who appeals from an administrative determination to show a lack of substantial evidence supporting that determination." Corman, 909 P.2d at 972. The Division has failed to meet its burden. The decision of the OAH and the Order Awarding Benefits is thereby affirmed.
[¶ 19] On July 7, 2003, the Division filed a motion asking the district court to reconsider its decision. The Division asserted that the district court's decision was contrary to a decision of the Wyoming Supreme Court issued on June 26, 2003, Salas v. General Chemical, 2003 WY 79, 71 P.3d 708 (Wyo. 2003), and that a mistake in footnote 2 of the decision letter indicated the district court may have misconstrued Dr. Jenkins' opinion that the injury was likely the result of heavy lifting.
[¶ 20] The district court issued a second decision letter on July 28, 2003. In that letter, the district court reassured the Division that it had not misunderstood the purport of Dr. Jenkins' letter. The district court also concluded that this Court's decision in Salas did not render his original decision to be wrong. For purposes of clarity, we recite our holding in Salas, as it is applicable to this case:
A claimant for worker's compensation benefits has the burden of proving all the essential elements of the claim by a preponderance of the evidence in the contested case hearing. In Re Worker's Comp. Claim of Johnson, 2001 WY 48, ¶ 7, 23 P.3d 32, ¶ 7 (Wyo.2001). We recently held that the substantial evidence test is the appropriate standard of review in appeals from Wyoming Administrative Procedures Act contested case proceedings when factual findings are involved and both parties submit evidence. Newman v. Wyoming Workers' Safety and Comp. Div., 2002 WY 91, ¶ 22, 49 P.3d 163, ¶ 22 (Wyo.2002) .... Because both parties presented cases-in-chief, we apply the substantial evidence standard. We afford respect and deference to a hearing examiner's findings of fact if they are supported by substantial evidence. Haagensen v. State ex rel. Workers' Comp. Div., 949 P.2d 865, 867 (Wyo. 1997). Our task is to examine the entire record to determine whether substantial evidence supported the hearing examiner's findings. State ex rel. Wyo. Workers' Comp. Div. v. Waggener, 946 P.2d 808, 814 (Wyo.1997). We will not substitute our judgment for that of the hearing examiner when substantial evidence supports his decision. Id. Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. Id. A hearing examiner's conclusions of law are afforded no special deference and will be affirmed only if truly in accord with law. State ex rel. Wyo. Workers' *456 Comp. Div. v. Barker, 978 P.2d 1156, 1159 (Wyo.1999).
Hermosillo v. State ex rel. Wyoming Workers' Safety and Compensation Div., 2002 WY 175, ¶ 6, 58 P.3d 924, 926 (Wyo. 2002).
An "injury" does not include a "condition preexisting at the time of employment with the employer against whom a claim is made[.]" Wyo. Stat. Ann. § 27-14-102(a)(xi)(F) (Michie 1997). The
burden is upon the claimant to prove that his work accident, not his preexisting condition, caused the necessity for the surgery. Matter of Corman, 909 P.2d 966, 970 (Wyo.1996); Matter of Claim of Fortier, 910 P.2d 1356, 1358 (Wyo.1996). While aggravation of a preexisting condition is a compensable injury, Matter of Injury to Carpenter, 736 P.2d 311, 312 (Wyo.1987), claimant must prove that his employment aggravated, accelerated, or combined with the disease or infirmity to produce the disability for which compensation is sought. Romero v. Davy McKee Corp., 854 P.2d 59, 61 (Wyo.1993); Lindbloom v. Teton Int'l, 684 P.2d 1388, 1390 (Wyo.1984).
State ex rel. Wyoming Workers' Compensation Div. v. Roggenbuck, 938 P.2d 851, 853 (Wyo.1997). "To prove aggravation of a preexisting injury, the claimant must demonstrate that the `work effort contributed to a material degree to the ... aggravation... of the existing condition of the employee.'" Frazier v. State ex rel. Wyoming Workers' Safety and Compensation Div., 997 P.2d 487, 490 (Wyo.2000) (quoting Lindbloom v. Teton Intern. 684 P.2d 1388, 1389-90 (Wyo.1984)) (emphasis omitted).
"[T]he causal connection between an accident or condition at the workplace is satisfied if the medical expert testifies that it is more probable than not that the work contributed in a material fashion to the ... aggravation ... of the injury. We do not invoke a standard of reasonable medical certainty with respect to such causal connection. Testimony by the medical expert to the effect that the injury `most likely,' `contributed to,' or `probably' is the product of the workplace suffices under our established standard....
[U]nder either the `reasonable medical probability' or more probable than not' standard, [a claimant succeeds] in demonstrating the causal connection by a preponderance of the evidence."
Hall v. State ex rel. Wyoming Workers' Compensation Div., 2001 WY 136, ¶ 16, 37 P.3d 373, 378 (Wyo.2001) (quoting In re Pino, 996 P.2d 679, 685 (Wyo.2000)).
Whether the employment "`aggravated, accelerated, or combined with the internal weakness or disease to produce the disability is a question of fact.'" Brees v. Gulley Enterprises, Inc., 6 P.3d 128, 131 (Wyo. 2000) (quoting Lindbloom, 684 P.2d at 1390).
Salas, ¶¶ 9-11.
[¶ 21] The Division's position with respect to a "preexisting condition" was correctly assessed by the district court:
The Hearing Examiner stated [Armijo] had met his burden of demonstrating the injury was compensable. Id. at ¶¶ 1-3. The Division here assumes there was a preexisting condition, then argues [Armijo] failed to meet his burden [Emphasis in original.]. In fact, the Hearing Examiner made no finding as to the existence of a pre-existing condition. The Division simply assumes as true that which was never shown to the Hearing Examiner's satisfaction. Clearly, the Hearing Examiner considered the evidence relating to the cause of the injury, including the possibility that it could have been the result of a pre-existing condition. Even so, he determined [Armijo] had demonstrated by a preponderance of the evidence the injury was caused by the work incident.... The Hearing Examiner properly considered the testimony and the evidence to make such a determination. This court will not simply re-weigh this evidence to reach a contrary conclusion. To do as the Division suggests, that is find the greater weight of the evidence leans toward disallowing benefits, would be inappropriate. See Salas, 2003 WY 79 at ¶ 9, 71 P.3d 708. The Court reiterates its findings and conclusions in its *457 Decision Letter that substantial evidence is contained within the record to support the Hearing Examiner's finding that [Armijo's] neck injury occurred in and as a result of the course of his employment with TP. The Hearing Examiner neither acted arbitrarily nor capriciously. The OAH's Order Awarding Benefits is affirmed and the Motion for Reconsideration is denied.
[¶ 22] In its brief, the Division argues that the evidence that Armijo had a preexisting condition is "compelling" and "overwhelming." It argues that Armijo's (and his other witnesses's) rendition of the facts is "staggeringly improbable." We will tarry only briefly with these challenges to the fact finding process that is in place to resolve worker's compensation claims. It is unlikely that Armijo fluently speaks either the argot of the Division's claims analysts or that of the medical profession. However, his testimony was plain and clear that he hurt his neck at work. At least two witnesses, his foreman and his girlfriend, corroborated this. All three testified at the hearing, so the hearing examiner could readily assess their credibility. Alicia Peters initially confirmed that Armijo was injured at work. It is not improbable that Armijo's communications with emergency room and other hospital personnel were garbled, unclear, misunderstood, misinterpreted, or just simply noted in the wrong chart. It is not improbable that an initial misstatement or misunderstanding was simply repeated three or four times until it came to be viewed as the "gospel truth."
[¶ 23] We hold that the hearing examiner's conclusion that Armijo proved his claim by a preponderance of the evidence is supported by the evidentiary record and that the district court did not err in concluding that there was substantial evidence in the record that Armijo suffered a compensable, work-related, on-the-job injury.

CONCLUSION
[¶ 24] The order of the district court, which affirmed the order of the hearing examiner, is affirmed. This matter is remanded to the district court with directions that it be further remanded to OAH in accordance with the district court's opinion letters.
NOTES
[1] No issues were raised in these proceedings as to the timeliness of Armijo's reporting of his injury. In an amendment to its pre-hearing disclosure statement, the Division indicated that Tony Peters would testify that Armijo did not inform him of the injury, but ultimately Peters did not testify at the hearing.
[2] Although the Division was not specific, the context of the letter indicates only sub-section 27-14-102(a)(xi) of that statute was applicable to Armijo's claim, and not sub-sub-section 27-14-102(a)(xi)(F).

(xi) "Injury" means any harmful change in the human organism other than normal aging and includes damage to or loss of any artificial replacement and death, arising out of and in the course of employment while at work in or about the premises occupied, used or controlled by the employer and incurred while at work in places where the employer's business requires an employee's presence and which subjects the employee to extrahazardous duties incident to the business. "Injury" does not include:
(A) Any illness or communicable disease unless the risk of contracting the illness or disease is increased by the nature of the employment;
(B) Injury caused by:
(I) The fact the employee is intoxicated or under the influence of a controlled substance, or both, except any prescribed drug taken as directed by an authorized health care provider; or
(II) The employee's willful intention to injure or kill himself or another.
(C) Injury due solely to the culpable negligence of the injured employee;
(D) Any injury sustained during travel to or from employment unless the employee is reimbursed for travel expenses or is transported by a vehicle of the employer;
(E) Any injury sustained by the prisoner during or any harm resulting from any illegal activity engaged in by prisoners held under custody;
(F) Any injury or condition preexisting at the time of employment with the employer against whom a claim is made;
(G) Any injury resulting primarily from the natural aging process or from the normal activities of day-to-day living, as established by medical evidence supported by objective findings;
(H) Any injury sustained while engaged in recreational or social events under circumstances where an employee was under no duty to attend and where the injury did not result from the performance of tasks related to the employee's normal job duties or as specifically instructed to be performed by the employer; or
(J) Any mental injury unless it is caused by a compensable physical injury, it occurs subsequent to or simultaneously with, the physical injury and it is established by clear and convincing evidence, which shall include a diagnosis by a licensed psychiatrist or licensed clinical psychologist meeting criteria established in the most recent edition of the diagnostic and statistical manual of mental disorders published by the American Psychiatric Association. In no event shall benefits for a compensable mental injury be paid for more than six (6) months after an injured employee's physical injury has healed to the point that it is not reasonably expected to substantially improve. [Emphasis added.]
[3] In its brief, the Division refined its statement of the issues so as to be identical to the statement of issues raised in this appeal.
[4] The district court issued two decision letters in this case, though neither was attached to the Division's brief.